IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **HARFORD MUTUAL INSURANCE COMPANY,** | |
| *Plaintiff*, | |
| v. | Civil No.: 1:24-cv-03019-JRR |
| **STARSTONE NATIONAL INSURANCE COMPANY,** | |
| *Defendant*. | |

## MEMORANDUM OPINION

Pending now before the court are Plaintiff Harford Mutual Insurance Company's ("HMIC") Motion for Summary Judgment (ECF No. 10, "HMIC's Motion") and Defendant StarStone National Insurance Company's Cross-Motion for Summary Judgment (ECF No. 16, "StarStone's Motion"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, HMIC's Motion will be granted, and StarStone's Motion will be denied.

**I.    UNDISPUTED FACTUAL BACKGROUND**

In their respective Motions, the parties provide the following undisputed factual background.

> Defendant and Plaintiff both provide excess liability insurance to Res One, a property management company which provided property management services at Friendly Gardens, an apartment complex located in Silver Spring, Maryland. ECF No. 1 ¶¶ 2–3. On March 3, 2022, a fire and ensuing explosion occurred, caused by the alleged accidental severing of a natural gas line by a Res One employee. *Id*. ¶ 3. As a result of this incident, numerous tenants sustained significant physical injuries, including serious burn injuries, as well as damage to their property. *Id*. Plaintiff afforded Res One primary insurance coverage through two separate policies in the combined total coverage amount of two million dollars. *Id*. ¶ 4. Specifically,

1

Res One was the Named Insured in one of Plaintiff's primary policies, and also qualified as an Insured under the primary policy Plaintiff afforded to Friendly Gardens. *Id*. ¶¶ 19, 20.

Plaintiff's primary insurance coverage has been fully exhausted in funding various tenant settlements, such that need for excess insurance coverage has been triggered. ECF No. 1 ¶ 4. There are also two separate excess policies applicable to this loss. *Id*. ¶ 22. Defendant afforded $5M in excess coverage to Res One, and Plaintiff separately provided $10M in excess coverage under the Umbrella afforded to Friendly Gardens, for which Res One also qualified as an Insured. *Id*. ¶¶ 23, 24.

Accordingly, there exists overlapping excess coverage, and a priority of coverage dispute has arisen between the parties as to whether Plaintiff's Umbrella policy or Defendant's "Following Form Excess Liability" policy has been triggered. ECF No. 1 ¶ 5. Specifically, Defendant maintains that its Following Form Excess Liability policy was not triggered, and it has no obligation to fund any settlements of tenant claims brought against Friendly Gardens and Res One until Plaintiff's Umbrella policy has been fully exhausted. *Id*. ¶ 7. Defendant has thus refused to contribute to any tenant settlements. *Id*. ¶ 6. Defendant's refusal has required Plaintiff to unilaterally fund approximately 5.4 million dollars in tenant settlements to date under its Umbrella policy in order to protect the interests of Res One. *Id*. ¶ 6. Plaintiff brought this declaratory action in order to resolve the ongoing priority of payment dispute among the parties.

A.   The Underlying Loss and Tenant Claim Settlements

The Friendly Gardens apartment complex was built in 1971 and is located on Laytonville Road in Silver Spring, Maryland. ECF No. 1 ¶ 14. It consists of several adjacent low-rise apartment buildings. *Id*. ¶ 14. The apartment complex is owned by Friends Non-Profit Housing, Inc. *Id*. Pursuant to a management contract with the property owner, Res One provided property management services for the apartment complex. *Id*. ¶ 14. On March 3, 2022, a maintenance employee of Res One went to apartment unit number 101 at the building located at 2405 Laytonsville Road in order to repair a clogged sink drain, and in so doing accidentally severed a natural gas line. *Id*. ¶ 15. As a result, an explosion and resulting fire occurred causing significant damage to the complex, and physical injuries to numerous tenants. *Id*. ¶ 15.

2

Due to the extensive nature of the incident, approximately 150 local firefighters and other emergency responders were called to the scene, and several residents required hospital care. *Id*. ¶ 15. Subsequent to this incident, numerous tenants have asserted property damage and personal injury claims against Res One and Friends Non-Profit Housing Inc. *Id*. ¶ 16. A representative of Res One notified both Plaintiff and Defendant in writing that Res One recognized that certain outstanding tenant personal injury claims were "extremely dangerous" and demanded that Defendant and Plaintiff "resolve these claims now." *Id*. ¶ 16. While Plaintiff has acted to protect the interests of its Insured, Defendant has not, and has refused to fund any settlements to date. *Id*. ¶ 6.

As of the filing of Plaintiff's Complaint in this Court, settlements totaling $7,504,326.72 have been paid out exclusively by Plaintiff to settle such claims, with many claims still unresolved. ECF No. 1 ¶ 17. Of that amount, 2 million dollars has been funded by the two applicable Plaintiff primary general liability policies. *Id*. ¶ 31. Therefore, accounting for the funding from the primary policies, Plaintiff has been forced to fund $5,504,326.72, in settlements to date from its Umbrella policy, an amount that exceeds the 5 million dollars coverage limits of Defendant's excess policy. *Id*. ¶ 31. Plaintiff has been forced to unilaterally contribute to these settlements utilizing its Umbrella policy because Defendant has not contributed anything towards settlement of these claims. *Id*. ¶¶ 6, 17. Instead, Defendant has taken the position that it has no obligation to fund any tenant settlements until the limits of Plaintiff's $10M Umbrella policy have been fully exhausted. *Id*. ¶¶ 7, 17.

**B.     The Insurance Policies Afforded to Res One**

   *1.  The Primary Coverage*

Plaintiff issued two separate primary commercial general liability policies that afforded coverage to Res One for this loss. ECF No. 1 ¶ 18. Specifically, Plaintiff issued Policy No. 9203196 to the "Friends Non-Profit Housing Inc. T/A Friendly Gardens Apartments". *Id*. ¶ 19. Accordingly, the owner of the apartment complex, Friends Non-Profit Housing Inc., was afforded $1M in primary coverage on a per occurrence basis covering the period May 1, 2021 – May 1, 2022. *Id*. ¶ 19. Res One also qualified as an insured under this primary policy because the definition of "Who Is An Insured" included any entity operating as a "real estate manager" for the named insured. *Id*. ¶ 19. Plaintiff separately issued Policy No. 9210741 to "Residential One, LLC". *Id*. ¶ 20. Accordingly, Res One has its own primary general liability policy that also

3

> afforded $1M in primary coverage on a per occurrence basis covering the period February 12, 2022 – February 12, 2023. *Id*. ¶ 20. As such, the total combined primary limit of Plaintiff's two policies is $2M. *Id*. ¶ 21. The total tenant claim settlements paid out to date under Plaintiff's two primary policies well exceed this $2M threshold, and thus, both of these primary policies have been fully exhausted, triggering Res One's excess coverage. *Id*. ¶ 21.
>
>   2. *The Excess Coverage*
>
> Res One also has two separate excess policies of liability coverage applicable to this loss. ECF No. 1 ¶¶ 22-24. Defendants issued Policy No. 77607P227ALI to Res One which is a "Following Form Excess Liability" policy with limits of $5M covering the period February 12, 2022 – February 12, 2023. (ECF No. 1-3 at p. 3.) In Defendant's "Schedule of Followed Policies", the only underlying primary policy referenced is Plaintiff's primary policy issued to Res One, i.e., Policy No. 9210741. (ECF No. 1-3 at p. 15.) Res One also qualifies as an Insured under Plaintiff's Umbrella excess coverage afforded to Friends Non-Profit Housing Inc., Policy No. CU10402382. (ECF No. 1-4 at pp. 3, 25.) The Umbrella, covering the period May 1, 2021 – May 1, 2022, has a $10M limit of coverage. (ECF No. 1-4 at p. 7.)

(ECF No. 10 at pp. 6–9; ECF No. 16-1 at p. 6)

HMIC initiated this action on October 17, 2024. (ECF No. 1.) The parties concur that this is a declaratory action involving a question of contract interpretation and that there are no factual disputes or need for discovery. (ECF No. 14.) On November 21, 2024, HMIC moved for summary judgment (ECF No. 10); on January 8, StarStone cross-moved for summary judgment (ECF No. 16). On January 24, 2025, HMIC filed a reply in support of its motion and response in opposition to StarStone's Motion. (ECF No. 19.)

## II. **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718

F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive").

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

**III.    ANALYSIS**

The parties concur that there are no disputes of material fact precluding summary judgment and that the sole question for this court to determine is whether Plaintiff's Umbrella Policy or Defendant's "Following Form Excess Liability" policy is last in priority of payment obligation to Res One. (ECF No. 10-1 at p. 11–12; ECF No. 16-1 at p. 8.) The parties stipulate that both policies are triggered by the exhaustion of Res One's primary coverage and that Res One's primary coverage has been exhausted. (ECF No. 10-1 at p. 4.)[1] For clarity, the court refers to Plaintiff's Umbrella Policy (Policy No. CU10402382) as the "Umbrella Policy," and to Defendant's Following Form Excess Liability Policy (Policy No. 77607P227ALI) as the "Excess Policy." As explained in depth below, the policy that the Excess Policy follows, HMIC's primary policy issued to Res One (Policy No. 9210741), is called the "Followed Policy." Res One's primary coverage policies, also offered by HMIC (Policy Nos. 9203196 and 9210741), are referred to collectively as the "Primary Policies."

**A. Principles of Construction and Relevant Terminology**

At the outset, the court sets forth the following general principles for construction of insurance policies under Maryland law.[2] Maryland courts construe insurance policies as they would any other type of contract: by "examin[ing] the character of the contract, its purpose, and the facts and circumstances at the time of execution" to determine the contracting parties' intent. *Pacific Indem. Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388 (Md. 1985). To decide "whether one liability insurer is primary with respect to another, Maryland courts 'recognize that

---

[1] By way of background, "primary insurance" is insurance that attaches immediately upon the happening of an occurrence that gives rise to liability, while "excess insurance" attaches only after the predetermined amount of primary coverage has been exhausted. *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 117 (1997).

[2] The parties agree that Maryland law governs here. (ECF No. 10-1 at p. 5; ECF No. 16-1 at p. 5.)

6

the rights and liabilities of different insurers should depend, as far as possible on the language of the policies.'" *Selective Way Ins. Co. v. Nationwide Property & Cas. Co.*, 242 Md. App. 688, 734 (2019), *aff'd*, 473 Md. 178 (2021) (quoting *Nolt v. U.S. Fid. & Guar. Co.*, 329 Md. 52, 60 (1993)); *see also Fed. Ins. Co. v. Firemen's Ins. Co. of Washington, D.C.*, 769 F. Supp. 2d 865, 871 (D. Md. 2011) (explaining "the primary principle of construction [when analyzing insurance policies,] is to apply the terms of the insurance contract itself").

Where the language of the insurance policy or policies in question is ambiguous, the court may consider extrinsic evidence to determine the parties' intent. *Pacific Indem. Co.*, 302 Md. at 389. A policy provision is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II*, 376 Md. 157, 167 (2003). If extrinsic evidence is unhelpful to resolve the ambiguity, Maryland courts construe the ambiguous language against the party responsible for drafting it, even when both parties are insurance companies. *Pacific Indem. Co.*, 302 Md. at 405; *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 116 Md. App. 143, 167–8 (1997).

Before moving to the merits of the parties' arguments, an explanation of the relevant terminology is appropriate. This case presents an issue of "double coverage" or, perhaps self-explanatorily, a situation where more than one insurance policy covers a claim. *Nat'l Indem. Co. v. Cont'l Ins. Co.*, 61 Md. App. 575, 578 (1985). Insurance policies often contain clauses, called "Other Insurance" clauses, that "limit the insurer's liability based on the availability of other coverage." *Id*. There are three general types of Other Insurance clauses: escape clauses, excess clauses, and *pro rata* clauses.

> An *escape clause* generally states that the insurer will not pay benefits under its policy when other insurance exists to compensate the claimant. In lease situations, especially those concerning commercial vehicles, a common limitation is an *excess clause.* This

> provision specifies that the insurance company will make payment on the policy so long as: 1) it becomes liable only after the claimant has recovered the sums available under the other policies involved, and 2) it pays an amount equal to the difference between the total insurance paid by the other companies and the limit of its own policy. In effect, if Policy A provides $100,000 insurance, and Policy B provides $150,000, then Policy B would pay $50,000 pursuant to an excess clause. Finally, a *pro rata clause* limits an insurer's liability to its proportionate share in relation to all available coverage.

*Id*. (citing 8A J. Appleman*, Insurance Law and Practice* § 4907.65 at 364 (rev. ed. 1981)).

In double coverage disputes, the court examines the "specific language of the policies" to determine the type of other insurance clause involved. *Id*. (quoting *Consol. Mut. Ins. Co. v. Bankers Ins. Co.*, 244 Md. 392, 396 (1966)). After classifying the other insurance clauses involved, the conflict between the clauses is resolved as follows:

> (1) An excess clause always prevails over an escape or a pro rata clause. In effect, the policy with either of the latter two clauses becomes primary coverage, and the excess insurer becomes secondarily liable. *Consol. Mut. Ins.,* 244 Md. at 400.
>
> (2) A conflict between two policies containing pro rata clauses results in each insurer sharing liability. Neither policy is considered primary or secondary. *Celina Mut. Cas. Co. v. Citizens Cas. Co.,* 194 Md. 236, 245 (1950); *Consol. Mut. Ins., supra.*
>
> (3) When a conflict occurs between two excess clauses, liability is shared equally by the insurers. *Ryder Truck Rental, Inc. v. Schapiro & Whitehouse, Inc.,* 259 Md. 354, 364–65 (1970).

*Id*. at 579; *see also Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co.*, 514 F.3d 327, 330–31 (4th Cir. 2008) (describing same hierarchy of priority). In view of the above-described principles of construction and applicable terminology, the court turns to the merits of the parties' arguments.

### B. StarStone's Excess Policy

The parties' first dispute is whether Defendant's Excess Policy contains an Other Insurance clause. This requires resolution at the outset because, if Defendant's Excess Policy does not

8

contain an Other Insurance clause, Plaintiff's Umbrella Policy's Other Insurance clause is determinative of the order of priority between the two policies. SCOTT M. SEAMAN & JASON R. SCHULZE, ALLOCATION OF LOSSES IN COMPLEX INSURANCE COVERAGE CLAIMS § 5:4 (March 2024) (noting where one "insurance contract contains an 'other insurance' clause and the other policy does not contain such a provision, courts generally will give effect to that lone 'other insurance' clause to effectuate the intent of the insurance contract."). In contrast, if Defendant's Excess Policy contains an Other Insurance clause, the court must analyze both Plaintiff and Defendant's Other Insurance clauses to determine the type of clause and, accordingly, the order of priority.

In pertinent part, Defendant's Excess Policy reads "[t]his policy applies only to damages covered by the Followed Policy as shown in Item 7[] of the Declarations. Except as otherwise provided by this Policy, the coverage follows the definitions, terms, conditions, limitations and exclusions of the Followed Policy in effect at the inception of this Policy." (ECF No. 1-3 at p. 5.) Item 7 describes the Followed Policy as HMIC's policy with coverage of Commercial General Liability. *Id*. at p. 15. The parties concur that StarStone's Excess Policy follows the Followed Policy or HMIC's primary policy issued to Res One (Policy No. 9210741). (ECF No. 10-1 at p. 9.)[3]

The Followed Policy includes the below Other Insurance clause:

    (1) This insurance is excess over:

---

[3] Plaintiff avers that Defendant admitted its Excess Policy contains no Other Insurance clause. (ECF No. 19 at p. 10.) While this is literally true, *see* ECF No. 7 ¶ 26, it does not alter the unambiguous language of Defendant's Excess Policy that it "follows the definitions, terms, conditions, limitations and exclusions of the followed policy." (ECF No. 1-3 at p. 5). Accordingly, the court does not interpret this admission as a concession that Defendant's Excess Policy does not incorporate the Primary Policy's Other Insurance clause. Defendant repeatedly insists that while its policy does not include an Other Insurance clause on its face, it adopts the followed policy – here the Primary Policy's – Other Insurance clause. *See* ECF No. 16-1 ("[B]ecause the StarStone policy is a Following Form policy which incorporates the terms of ResOne's primary policy, including its Other Insurance clause, it in fact *does* contain an Other Insurance clause.").

9

> (a) Any of the other insurance, whether primary, excess, contingent or on any other basis:
>
> (i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
> (ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;
> (iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or
> (iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I - Coverage A - Bodily Injury And Property Damage Liability.
>
> (b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(ECF No. 10-2 at p. 32.)  The Followed Policy also contains the below endorsement, which modifies the above Other Insurance clause:

> 4. Other Insurance
> b. Excess Insurance [-] With respect to your liability arising out of your management of property for which you are acting as real estate manager, this insurance is excess over any other valid and collectible insurance available to you, whether such insurance is primary or excess.

(ECF No. 10-2 at p. 64.)

As the Supreme Court of Maryland has explained, "follow form" policies, such as StarStone's, are common for excess insurers.

> Excess insurers frequently agree to provide coverage to an insured in excess of agreed types and amounts of underlying insurance, without having seen copies of the underlying policies or, in many cases, without even knowing the name of the company that is to provide the underlying insurance, leaving such matters 'to be advised.' In the common situation where an insured purchases both primary and excess coverage for a single risk, there are two (or more) separate policies of insurance, each separately negotiated. The insured typically undertakes to obtain primary and excess

> policies that complement each other in that, upon exhaustion of primary limits, the excess policy will be triggered, thereby fully protecting the insured against the perils for which insurance was initially sought.
>
> . . .
>
> Thus, a following form excess policy often incorporates by reference the terms and conditions of the underlying policy. It is well settled that the obligations of following form excess insurers are defined by the language of the underlying policies, except to the extent that there is a conflict between the two policies, in which case the wording of the excess policy will control.

*Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 654–55 (2002) (quoting Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* 817–18 (11th ed. 2002)).

Plaintiff relies on a single case – *Through Transport Mutual Insurance Association Limited v. StarStone National Insurance Company*, 628 F. Supp. 3d 1087 (D. Kan. 2022) – to support its argument that Defendant's Excess Policy lacks an Other Insurance clause. (ECF No. 10-1 at p. 14.) In that case, the District of Kansas analyzed whether another of StarStone's follow form excess policies was triggered upon the exhaustion of the followed policy or upon the exhaustion of both the followed policy and an additional primary policy. The court distinguished the facts in *Through Transport* from other cases cited by StarStone on the grounds that, in the other cases, the excess policies at issue contained "language unambiguously providing that coverage under the policy would be triggered only when all other insurance was exhausted." 628 F. Supp. 3d at 1098. In contrast, in the policy at issue in *Through Transport*, "[t]he StarStone policy does not contain an 'other insurance' clause (or any similar provision) . . . where the excess policies provided coverage only after all other policies were exhausted." *Id.* at 1101. In short, the court in *Through Transport* distinguished StarStone's excess policy from other excess policies that included Other Insurance clauses specifying that the policies were triggered only after exhaustion of all primary policies. The court held that StarStone's policy was triggered after the exhaustion of the followed

11

policy (instead of both the followed policy and the other primary policy), as the policy in question unambiguously provided that it applied in excess of the followed policy and did not reference any other primary policies.

This court does not read *Through Transport* to support Plaintiff's contention that Defendant cannot, in this case, adopt the definitions, terms, conditions, and limitations – including the Other Insurance clause – of the Followed Policy. Nor did the court in *Through Transport* discuss whether the followed policy in that case included an Other Insurance clause. The unambiguous language of Defendant's Excess Policy here indicates that it "follows the definitions, terms, conditions, limitations and exclusions of the Followed Policy," and Plaintiff introduces no evidence or persuasive case law to support its argument that the Followed Policy's Other Insurance clause is excluded from the followed definitions and terms. Accordingly, the court is persuaded that Defendant's Excess Policy incorporates the above-recited Other Insurance clause from the Followed Policy.

C. **Application of the "True Excess" Rule**

Plaintiff next argues that, accepting Defendant may adopt the Followed Policy's Other Insurance clause, Plaintiff's Umbrella Policy would nonetheless be second in priority to Defendant's Excess Policy as the Other Insurance Clause in the Followed Policy is a "'coincidental excess' clause," whereas Plaintiff's Umbrella Policy contains a "true excess" clause. (ECF No. 10-1 at p. 15.)

In *Horace Mann Insurance Company v. General Star National Insurance Company*, the Fourth Circuit, applying West Virginia law, determined that a true excess policy – or a policy expressly dependent upon exhaustion of the limits of underlying primary liability insurance – was subordinate in priority to a "coincidental excess policy" – or a policy that did not require other

12

insurance – and was not explicitly limited to losses in excess of an underlying insurance policy. 514 F.3d 327, 333 (4th Cir. 2008). This was true even when the "coincidental excess policy" contained an Other Insurance clause that signified the policy was intended to be excess to any other policy that may exist. "Because the other-insurance clause does not make coverage in all cases dependent on the exhaustion of the limits of an underlying insurance policy, the other-insurance clause does not transform the policy into a true excess policy." *Id*.

Here, the parties do not dispute that both Plaintiff's Umbrella Policy and Defendant's Excess Policy are true excess policies. (ECF No. 19 at p. 12.) The Followed Policy is a primary policy with an Other Insurance clause that purports to make it excess in certain circumstances (*see* ECF No. 10-2 at p. 32), making it a coincidental excess policy. *See Horace Mann*, 514 F. 3d at 332 (defining coincidental excess policies as "policies that provide primary liability coverage but operate as excess in a given case because of an other-insurance clause"). Thus, Plaintiff's argument is that, by incorporating the Other Insurance clause of a coincidental excess policy, Defendant's Excess Policy becomes a coincidental excess policy and is therefore primary in coverage to Plaintiff's true excess Umbrella Policy. (ECF No. 19 at p. 14 ("the 'other insurance' clause as amended by the Real Estate Endorsement that StarStone purports to adopt as its own is a coincidental excess provision."). Plaintiff asserts: "Simply put, because a primary insurer cannot utilize 'coincidental excess' language contained in the primary coverage to render such coverage last in the priority of payment hierarchy over a true excess policy like the HMIC Umbrella, StarStone, attempting to utilize that same clause, is in no better position to do so." (ECF No. 19 at p. 15.) Plaintiff, however, cites no law to support this contention.

In all of the cases Plaintiff cites, where courts applied the "true excess" rule, its effect was to require the exhaustion of a primary policy containing a coincidental excess Other Insurance

clause before reaching a true excess policy. *See Mut. Assurance Soc'y of Virginia v. Fed. Ins. Co.*, No. 20-1149, 2022 WL 112078, at *7 (4th Cir. Jan. 12, 2022) (affirming district court's summary judgment finding that primary insurance policy with an Other Insurance clause was a coincidental excess policy); *Institute for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 425-26 (2d Cir. 1994) (applying Pennsylvania law and holding that the policy that did not require underlying insurance must be exhausted before a "true umbrella policy"); *National Farmers Union Prop. & Cas. Co. v. Farm & City Ins. Co.*, 689 N.W.2d 619, 624 (S.D. 2004) (explaining that "a primary insurance provider cannot hide behind an excess insurance clause in its 'other insurance' provision to require an umbrella insurer to cover liability for its insured"); *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.*, 494 N.W.2d 216, 218-19 (Iowa 1992) (holding that primary coverage, and not umbrella policy, had priority based on "a common sense look at the basic function each policy was intended to serve"); *Atkinson v. Atkinson*, 254 Ga. 70, 77 (1985) (holding primary policy with limited situation in which it became an excess policy had priority over an excess policy that was not written to provide primary coverage); *U.S. Fire Ins. Co. v. Maryland Cas. Co.*, 52 Md. App. 269, 280 (1982) (holding that umbrella policy only need contribute after primary coverage policy made excess only in limited circumstance was exhausted). No authority is cited where a true excess policy was forced to become a primary policy over its clear design as an excess policy because it adopted the Other Insurance clause of a primary policy.

Plaintiff relies on cases in which courts, applying the "true excess" rule, found that primary insurers may not use Other Insurance Clauses to render their coverage last in the priority of payment behind true excess policies. Plaintiff has not, however, cited any case where a court (in or outside the Fourth Circuit) made the extension Plaintiff asks this court to make; namely, that a

14

true excess policy that is also a Follow Form excess policy (like Defendant's Excess Policy) and thus adopts the primary insurer's Other Insurance clause transforms into a primary policy.

### D. Plaintiff's Umbrella Policy's and Defendant's Excess Policy's Other Insurance Clauses

In view of the above determinations that Defendant's Excess Policy adopts the Followed Policy's Other Insurance clause and that the true excess rule does not transform Defendant's Excess Policy into a conditional excess policy, the court turns to categorizing and comparing the Other Insurance clauses in Defendant's Excess Policy and Plaintiff's Umbrella Policy. As a reminder to the reader, there are three categories of Other Insurance clauses: excess clauses, *pro rata* clauses, and escape clauses; and Maryland courts resolve priority of coverage disputes as follows: an excess clause prevails over an escape or *pro rata* clause; two *pro rata* clauses share liability; and two excess clauses share liability. *Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co.*, 514 F.3d 327, 330–31 (4th Cir. 2008); *Nat'l Indem. Co. v. Cont'l Ins. Co.*, 61 Md. App. 575, 579 (1985).

The parties concur that the Other Insurance clause in Plaintiff's Umbrella policy is an excess clause. (ECF No. 16-1 at p. 15.) The parties disagree, however, whether the Other Insurance clause in Defendant's Excess Policy (as adopted from the Followed Policy) is an excess or *pro rata* clause. An excess clause "provides that the insurer will be liable only after the exhaustion of the limits of any other applicable insurance." *Horace Mann*, 514 F.3d at 330. A *pro rata* clause "limit[s] the insurer's liability to its pro rata share of the loss in the proportion that its policy limits bear[ ] to the aggregate of available liability coverage." *State Farm Mut. Auto. Ins. Co. v. U.S. Fid. & Guar. Co.,* 490 F.2d 407, 410 (4th Cir. 1974); *see also Nolt v. U.S. Fid. & Guar. Co.*, 329 Md. 52, 60 (1993) (describing an Other Insurance clause that provided the share and proportion of the insurance that the policy covered as a "typical *pro rata* clause").

15

Defendant's Other Insurance clause includes both an excess and a *pro rata* clause. First, it provides that it is excess over the following insurance policies:

> b. Excess Insurance
> (1) This insurance is excess over:
>
> (a) Any of the other insurance, whether primary, excess, contingent or on any other basis:
>
> (i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
> (ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;
> (iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or
> (iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I - Coverage A - Bodily Injury And Property Damage Liability.
>
> (b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(ECF No. 10-2 at p. 32.) The parties do not aver that Plaintiff's Umbrella Policy fits into the above-described categories of other insurance policies.

In an endorsement to section 4(b)(1), above, the Followed Policy includes the following modification:

> 4. Other Insurance
> b. Excess Insurance [-] With respect to your liability arising out of your management of property for which you are acting as real estate manager, this insurance is excess over any other valid and collectible insurance available to you, whether such insurance is primary or excess.

16

(ECF No. 10-2 at p. 64.)  The parties agree that the liability in this case arises from Res One's management of the at Friendly Gardens property.  *See* Undisputed Facts, *supra*.  The "Other Insurance" section of the Followed Policy, also contains the following *pro rata* clause:

> c. Method of Sharing
>
> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

(ECF No. 10-2 at p. 32.)

Defendant recognizes that the language of its Other Insurance policy "might suggest that this is a pro rata clause" but urges that a full reading of the section makes clear that it is *pro rata* only in certain circumstances, none of which is present here. (ECF No. 16-1 at p. 18.) Defendant is correct.  Defendant's Excess Policy's Other Insurance clause, and the endorsement thereto, specifies: "[w]ith respect to your liability arising out of your management of property for which you are acting as real estate manager, this insurance is excess over any other valid and collectible insurance available to you, whether such insurance is primary or excess."  To ignore this unambiguous language would contravene core principles of construction.[4] *See Hamilton Jewelry, LLC v. Twin City Fire Ins. Co., Inc.*, 560 F. Supp. 3d 956, 961 (D. Md. 2021) (explaining that Maryland courts interpret the language of an insurance policy "according to its usual, ordinary and accepted meaning").  Said differently, Plaintiff's suggestion that the *pro rata* clause in Defendant's

---

[4] Defendant's final argument is that because HMIC drafted the Umbrella policy and the Primary Policies (including the Followed Policy), to the extent the court finds the Other Insurance clause in the Followed Policy ambiguous, it should resolve such ambiguity against HMIC.  This is unavailing, because the court does not find the Followed Policy's Other Insurance clause or endorsement thereto ambiguous.

Excess Policy applies here renders the endorsement meaningless. Maryland courts are loath to endorse contract construction that renders unambiguous text superfluous or meaningless. *Kolb v. ACRA Control, Ltd.*, 21 F. Supp. 3d 515, 532 (D. Md. 2014) (holding that "a contract should not be read to include meaningless or superfluous language.").

The Other Insurance clause in Plaintiff's Umbrella Policy provides:

> This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. . . . When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of (1) the total amount that all such other insurance would pay for the loss in the absence of the insurance provided under this coverage part; (2) The total of all deductible and self-insured amounts under all that other insurance.

(ECF No. 1-4 at p. 28.)

The two Other Insurance clauses in question are thus in conflict. Each purports to be excess to the other. *See Horace Mann*, 514 F.3d at 331 (explaining that in cases where two policies contain excess Other Insurance Clauses, "each insurer will contend that its other-insurance clause makes it excess to the other and that the other policy must therefore provide primary coverage. In such cases there typically is no language in either policy that gives a court a contractually-based way to decide which policy should be excess to the other."). In *Horace Mann*, the Fourth Circuit explained that

> In cases where there are actual conflicts in the language of the clauses, or where a literal application of the clauses could leave the insured without coverage, various methods for resolving the issue have gained acceptance. Some courts find conflicting other-insurance clauses to be "mutually repugnant" and thus unenforceable and require the insurers to bear pro-rata shares of the total liability. *See, e.g., State Farm,* 490 F.2d at 410; *Hoffmaster v. Harleysville Ins. Co.,* 441 Pa.Super. 490, 657 A.2d 1274, 1277 (1995). Other courts, however, resolve the conflicts by considering the "total policy insuring intent." Under this approach, where conflicting other-insurance clauses "cannot be resolved by the logic

> of their terms, the insurer whose coverage was effected for the primary purpose of insuring the particular risk should be primarily liable for payment, with the insurer whose coverage was most incidental to risk being liable last." 15 Russ & Segalla, *Couch on Insurance* § 219:49; *see, e.g., Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co.,* 307 Minn. 173, 239 N.W.2d 445, 446–47 (1976).

*Id*. at 331.

In the Motions at bar, the parties do not address allocation of liability in the event the two excess clauses at issue are irreconcilable. HMIC and StarStone each seek judgment and declaration that, respectively, either Defendant or Plaintiff must cover the full extent of its policy limits. For the reasons set forth above, the court will not now make such a declaration. The two Other Insurance clauses are repugnant to each other; neither policy is excess to the other as a matter of law. Accordingly, the court will deny both Motions.

### IV.   **CONCLUSION**

For the foregoing reasons, by separate order, HMIC's Motion will be denied, and StarStone's Motion will be denied.

September 15, 2025

/S/
_____
Julie R. Rubin
United States District Judge